# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**KATHLEEN DUNFORD,**

                         **Plaintiff,**

**-vs-**                                         **Case No.  6:04-cv-751-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                         **Defendant.**

_____

# ORDER

This matter came before the Court for consideration without oral argument on the complaint filed by Kathleen Dunford seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 6.  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05 for adjudication.  Doc. Nos. 7, 9.

## I.    PROCEDURAL BACKGROUND.

On October 26, 2001, Dunford applied for widow's insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq.*,

alleging a disability onset date of September 10, 1996.  TR. 54-56.[1]  The SSA denied Dunford's

application both initially and on reconsideration.  TR. 39-40, 42-43.  Then, Dunford made a timely

request for a hearing.  TR. 38.

An Administrative Law Judge ("ALJ") held a hearing on August 8, 2003.  TR. 290.

Dunford, who was accompanied by her attorney, testified at the hearing.  TR. 290-317.

The ALJ found that Dunford had not engaged in substantial gainful activity since

September 10, 1996, the alleged onset date of her disability.  TR. 24.  She was insured through

February 25, 1997.  TR. 24.  The ALJ concluded that the medical evidence showed Dunford had

the medically determinable impairments of rheumatoid arthritis, hypertension, and osteoporosis.

TR. 21.  The ALJ found that these impairments were severe, but that they did not equal or meet

any impairment listed in the SSA's regulations.  TR. 21.

The ALJ found further that Dunford's allegations regarding her limitations were not totally

credible.  TR. 22.  After reciting various items of medical evidence in the record, the ALJ stated:

> The claimant testified that, when she was first diagnosed in 1996, she experienced
> difficulties with her hand and that she was unable to cut her food; however, on grip-
> strength testing in June 1996 she was able to grip up to 35 pounds on the right and
> up to 15 pounds on the left.  (Exhibit 1F)  The claimant also testified that her
> hobbies consisted of cross stitching and ceramics which she only discontinued a
> year to 1.5 years ago.  In September 1996 Dr. Feinman reported that the claimant's
> left wrist was tender but had full range of motion.  The claimant testified that she
> required a cane for ambulation prior to 1998.  There was no indication in the record
> that the claimant was then prescribed an assistive device for ambulation.  I find that
> the testimony at the hearing was not consistent the medical findings during the

---

[1] Dunning filed for disabled widow's benefits based upon the work record of her deceased husband, John Crowling.  Crowling died on February 25, 1990.  TR. 54.  To qualify for disabled widow's benefits, Dunning must have attained age 50, be unmarried, and be under a disability that began no later than seven years after Crowling's death.  *See* Doc No. 15 n.7.  There is no dispute about any of these factors except whether Dunning is disabled and, if so, the onset date of her disability.

> prescribed period and that her symptoms were exaggerated.  Accordingly, I find that
> the testimony at the hearing was not fully credible.

TR. 22.

Based upon the documentary evidence and testimony, the ALJ determined that Dunford had the residual functional capacity ("RFC") to walk, stand, or sit for up to six hours in an eight-hour workday, frequently lift or carry up to ten pounds, and occasionally lift or carry up to twenty pounds.  TR. 22.  The ALJ further found that this RFC would not allow Dunford to perform her past relevant work.  TR. 22.  Using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt P, App. 2 (the "grids"), the ALJ concluded that Dunford could perform "essentially a full range of light work" and, therefore, was not disabled.  TR. 23.

Dunford requested review of the ALJ's decision.  TR. 13, 285-89.  The Appeals Council considered the merits of Dunford's request and found that there was no basis for changing the ALJ's decision.  TR. 6-7.  Dunford timely sought review of this decision by the United States District Court.  Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Dunford's application for disability benefits under OASDI.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g).

## III.     STATEMENT OF FACTS.

A.     *Dunford's Testimony.*

Dunford was born on November 4, 1943.  TR. 300.  She stood five feet two and one half inches tall and weighed 177 pounds at the time of her hearing.  TR. 303.  She was married to her first husband from 1964 until his death in 1990.  TR. 299.  At the time of the hearing, she was divorced from her second husband.  TR. 299.

Dunford graduated from high school in 1961, and she received some vocational training to work as a printer.  TR. 300.  She worked as a printer for the United States government for thirty years.  TR. 300.  This job required lifting pieces of metal that each weighed twenty-five pounds.  TR. 302.

Dunford had high blood pressure.  TR. 306.  She started taking Embril in 1999, went off of it for a while because she could not afford it, then began taking it again after a doctor obtained financial assistance for her.  TR. 310.  Dunford estimated that she had gained twenty-five or thirty pounds since her onset date of disability due to Prednisone[2] she had taken.  TR. 303.  Her weight had been as high as 190 pounds within a year of her hearing.  TR. 307.

When she was first diagnosed with arthritis, her pain was "horrible" because she had no medication.  TR. 317.  Thereafter, at different periods of time, she could "hardly move" due to her arthritis.  TR. 312.  Dunford also had a pinched nerve in her right hand, and wore a brace on her left hand because it "hurt[] like hell."  TR. 313. When she was first diagnosed in 1996, she needed

---

[2] Prednisone is a steroid used to treat inflammation and infections, and is often administered to arthritis patients. DRUGS.COM, *at* http://www.drugs.com/prednisone.html (last visited Sept. 19, 2005) (hereinafter "Drugs.com")

assistance to roll over in bed, to feed herself, and to use a restroom because of pain.  TR. 311-12.

Walking at that time was very difficult, so she began using a cane.  TR. 312.

      At the time of the hearing, Dunford had good days and bad days.  TR. 314.  On a good day

she could go to the grocery store, and on a bad day she would not "do a whole lot."  TR. 314.  In a

typical week she would have four bad days and three good days.  TR. 314.  Pain made her

depressed and fatigued.  TR. 59, 61.

      She could not sit in one position for more than one half of an hour before needing to move

to relieve discomfort.  TR. 314.  She could stand in one place for approximately fifteen or twenty

minutes.  TR. 314.  The furthest distance she could walk was "from the house to the mailbox and

back again," and she opined that this distance was roughly equivalent to half of a city block   TR.

314-15.  She stated that, at the time of the hearing, she would sit for about five hours in an eight-

hour day, occasionally bend and reach, and walk or stand for two hours per day, but she would

need to alternate positions.  TR. 316.  She could lift a gallon of milk with two hands.  TR. 315.

She had to carry things such as groceries "a little bit at a time" rather than in bagfuls.  TR. 313.

She had trouble performing tasks such as opening a jar or a doorknob.  TR. 312.  Making beds was

difficult for her.  TR. 307.  She had difficulty preparing meals because she could not stand for long

periods.  TR. 61.  Dunford was able to take care of her own personal hygiene and grooming needs.

TR. 311.  She did not sleep well at night, and tossed and turned because her hips hurt.  TR. 313.

The extent of her day-to-day activity had not changed since 1996 or 1997.  TR. 316.

      Dunford socialized on the telephone and once each month she went out to lunch.  TR. 304.

She drove an automobile.  TR. 304.  She spent much of her time reading, listening to music, and

watching television.  TR. 304.  She used to do cross-stitching and ceramics as hobbies, but had

stopped both activities over a year before her hearing because of problems with her hands.  TR.

308-09.  She did not exercise because her doctor told her that the only exercise she could perform

was swimming, and there was no pool she could use.  TR. 309.  She had used a cane, due to

stiffness and swelling in her feet, but was not using one at the time of her hearing.  TR. 309-10.

      B.    *Medical Evidence.*

Dunford was treated by C.P. Hamilton, M.D., beginning at least by April 1996.  At that

time, she complained of hand, arm, and left foot pain.  TR. 234-35.

An occupational therapist examined Dunford in June 1996.  At that time, Dunford

complained of having difficulty washing her back due to shoulder pain.  The therapist noted that

Dunford had rheumatoid arthritis with resulting pain and stiffness in her joints.  Her grip strength

on the right was thirty-five to forty-five pounds, and on the left it was fifteen pounds. The therapist

recommended a home program designed to increase Dunford's range of motion. TR. 108.

A medical record dated July 24, 1996, reflects that Dunford complained of joint pain and

stiffness in her arms.  TR. 116.

On September 10, 1996, Mitchell Feinman, M.D., examined Dunford.  His assessment was

rheumatoid arthritis (RA) and left knee pain with fluid accumulation (effusion).  He decreased the

amount of Prednisone Dunford was taking, and added other medications.  TR. 124-25.  In

December, Dr. Feinman referred Dunford to a podiatrist to address her complaints of foot pain.

TR. 123.  In February 1997, Dunford returned to Dr. Feinman complaining of swelling and pain in

her right foot.  Upon examination, Dr. Feinman found that Dunford had full range of motion, but

that her right ankle was swollen and tender with edema.  His assessment was RA, hypertension,

and obesity.  He continued to treat Dunford with medication.  TR. 121-22.  On April 10, 1997,

Dunford still complained of right foot pain and swelling.  After examination, Dr. Feinman's

assessment was RA and osteopenia.[3]  He prescribed new medication, which Dunford subsequently

reported helped alleviate her morning stiffness and gave her more energy.  TR. 267, 269.

However, Dunford still complained of right ankle swelling and pain.  TR. 263, 265.  Dr. Feinman

repeatedly noted that Dunford's hypertension was uncontrolled.  TR. 239, 266.  In follow-up visits,

Dunford complained of pain in her left foot and ankle, TR. 259, hands, feet, left shoulder, and left

arm, TR. 257.

On February 22, 1997, Michael C. Edwards, Jr., D.P.M., examined Dunford at the request

of her rheumatologist.  He noted that Dunford had fluid accumulation (effusion) in her right ankle.

Dr. Edwards prescribed custom insoles to be placed in her shoes.  TR. 114.

On August 31, 1998, Gail H. Sacher, M.D., examined Dunford.  TR. 176.  At that time,

Dunford complained of morning stiffness and difficulty with her elbows and wrists.  Dr. Sacher

noted that Dunford had warmth and pain during a range of motion test of both wrists and

synovitis[4] of both elbows with flexion contractures.[5]  TR. 177.  Dr. Sacher's assessment was

---

[3] "Both *osteoporosis* and *osteopenia* are medical terms for progressive loss of bone density and thinning of bone tissue. Osteoporosis is a metabolic bone disease characterized by a severe decrease in bone mass that increases the risk of a fracture. Osteopenia refers to milder bone loss that doesn't yet meet the criteria of osteoporosis." MayoClinic.Com, *Osteopenia*, at http://www.mayoclinic.com/invoke.cfm?id=HQ01154 (last visited Sept. 19, 2005) (emphases original).

[4] Synovitis is inflammation of the vascular membrane covering the rounded end of a bony structure, especially at a joint. STEDMAN'S MEDICAL DICTIONARY 1746 (26th ed. 1995) (hereinafter "Stedman's").

[5] Contracture refers to a "[s]tatic muscle shortening due to tonic spasm or fibrosis, or to loss of muscular balance, the antagonists being paralyzed."  Stedman's at 389.

rheumatoid arthritis.  She increased the dosage of Dunford's prescription medication.  TR. 177.  In October 1998, Dunford complained of pain and morning stiffness.  TR. 175.  Dr. Sacher continued to treat Dunford with medication.  Dr. Sacher noted decreased range of motion in Dunford's hands and elbows in February 1999 and thereafter.  TR. 173, 174.  Beginning in October 1999, Dr. Sacher began to diagnose Dunford with osteoporosis.  TR. 170. By November 2000, Dr. Sacher observed rheumatoid deformities of both of Dunford's hands with some synovitis, and decreased range of motion in her ankles.  TR. 161.

Dunford began treatment with Lloyd Bennett, M.D., in March 1999.  At the first examination, Dr. Bennett noted that Dunford's RA was stable.  TR. 140.

On March 11, 1999, Hector E. Ramirez, M.D., examined Dunford upon the referral of a Dr. Bennett.  TR. 199-201.  Dr. Ramirez noted that Dunford "ha[d] some discomfort in her joints, [b]ut not very intense."  TR. 200.   Dr. Ramirez observed diminished range of motion in her wrist and elbows and some tenderness throughout shoulder range of motion.  TR.  201.

A Dexa bone scan taken in January 2000, disclosed a statistically significant decreased bone density in the lumbar spine.  TR. 138.

On September 25, 2000, Lloyd E. Bennett, M.D., noted that Dunford's arthritis was severe but stable, and that her hypertension was under "good control."  Dunford also had osteoporosis. TR. 134.  Dr. Bennett reached similar conclusions after examining Dunford on March 26, 2001, and September 26, 2001.  TR. 130-31.

On April 1, 2002, Dr. Sacher assessed Dunford with ulnar nerve entrapments.  TR. 209. She administered an injection and steroids to reduce the swelling in Dunford's right elbow.  TR.

209.  At subsequent visits, Dr. Sacher continued to assess Dunford with arthritis and nerve

entrapment and continued the same treatments she had prescribed from 1998 through 2001.  TR.

203-08.

On June 17, 2002, Carlos K. Woodward, M.D., examined Dunford.  TR. 202.  Dr.

Woodward noted that she had a positive Tinel's sign test[6] and a positive elbow flexion test.[7]  TR.

202.  Dr. Woodward opined that Dunford had "some element of ulnar neuropathy,"[8] and

recommended that she undergo further testing.  TR. 202.

    C.    *Reviewing Physicians' Opinions.*

James J. Green, M.D., completed a State Agency Medical Summary Sheet on November 9,

2001.  TR. 148.  Dr. Green stated that there was "insufficient evidence for adjudication" of

Dunford's disability benefits claim.  TR. 148.

On February 18, 2002, Hilda Tung, M.D., at the behest of the Florida Office of Disability

Determinations, completed a Medical Summary Sheet regarding Dunford.  TR. 197.  Dr. Tung

noted Dunford's arthritis, osteoporosis, and hypertension, and concluded that these impairments

---

[6] The Tinel's sign test is "[a]n examination test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve.  For example, in a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often 'positive' and causes tingling in the thumb, index, and middle fingers."  MedicineNet, Inc., *Definition of Tinel's Sign, at* http://www.medterms.com/script/main/art.asp?articlekey=16688 (last visited Sept. 19, 1005).

[7] "This test begins with the client in a standing or seated position. With the shoulder laterally rotated, the client brings the elbow into full flexion while the forearm is supinated and the wrist is hyperextended. This is the position used when carrying a tray, for example. If the condition is unilateral, it is helpful to have the client adopt the position with both sides at the same time so a comparison with the unaffected side can be made. Cubital tunnel syndrome [which is a type of nerve entrapment syndrome] is probable if symptoms are reproduced within about 60 seconds while holding this position."  Whitney Lowe, *Assess and Address: Ulnar Nerve Entrapment*, 114 MASSAGE (Mar.-Apr. 2005), *available at* http://www.massagemag.com/2005/issue114/assess114.3.htm (last visited Sept. 19, 2005).

[8] A neuropathy is "a disease involving the cranial nerves, or the peripheral or autonomic nervous systems." Stedman's at 1204.

did not affect her functioning and were not severe.  TR. 197.  This sheet contained no findings

regarding the specifics of Dunford's functioning, and only a skeletal explanation of how Dr. Tung

formed her opinion.

**IV.     STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under OASDI, a claimant must be

unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which has lasted or can be expected to last for a continuous period

of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or

mental impairment" under the terms of the Act is one "that results from anatomical, physiological,

or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides

further that a claimant is not disabled if he or she is capable of performing his previous work.  42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In a case seeking disability benefits under OASDI, the

claimant also must show that he or she became disabled before his or her insured status expired in

order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d

1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the

correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the

findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.      ANALYSIS.

On appeal to this Court, Dunford contends that the ALJ's opinion regarding her RFC is not supported by substantial evidence because none of her treating or examining physicians prepared a functional limitations assessment. She asserts, as well, that the ALJ did not properly assess her complaints of pain and the functional limitations arising from pain. Finally, she submits that the ALJ erred in relying upon the grids in determining whether there was available work that she could perform.

With respect to the first issue, the law is clear that an ALJ may not act as both judge and physician, and his RFC findings must be consistent with the objective medical evidence in the

record–they may not be the product of the ALJ's own medical conclusions. *See Hernandez v. Barnhart*, 203 F. Supp. 2d 1341, 1355 (S.D. Fla. 2002) (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992)). However, the final determination of a claimant's RFC rests solely with the ALJ, and, so long as it is supported by substantial evidence, is binding on the claimant. 20 C.F.R. § 404.1546.

Before the date Dunford was last insured under OASDI, she was treated by Dr. Hamilton, Dr. Feinman, and examined by a occupational therapist. The record does not contain a Medical Source Statement addressing Dunford's RFC any of these treating professionals.[9] Beginning in August 1998, Dunford began treatment with Gail H. Sacher, M.D. Dr. Sacher also did not provide a Medical Source Statement addressing the functional limitations caused by Dunford's impairments. Indeed, the only assessment of Dunford's RFC in the record is the opinion of Dr. Tung, a reviewing physician, who opined in 2002 that Dunford would have had no functional limitations from her impairments as of February 1997.

The Commissioner argues that the Social Security regulations do not require an ALJ to obtain a medical source statement, noting that 20 C.F.R. § 404.1513 provides that a record will not be considered incomplete if there is no medical source statement. I note, however, that regulation 404.1513 also states that the SSA will seek a medical source statement. There is no indication that the SSA sought such statements in this case, but was unable to obtain them.

Courts in this circuit have concluded that a medical source statement should be obtained when the ALJ's RFC assessment appears to be based on the ALJ's interpretation of medical data

---

[9] A medical source statement is an opinion by a treating or consulting physician regarding what the claimant can do despite her impairments. Soc. Sec. Ruling 96-5p, at *3 (1996).

unassisted by the opinions of treating or examining physicians.  For example, in *Coleman v. Barnhart*, the court held that an ALJ committed reversible error when he concluded that a claimant could complete the full range of medium work in the absence any RFC assessment from a treating or examining physician in the record.  264 F. Supp. 2d at 1010-11.  Likewise, in *Thomason v. Barnhart*, the ALJ found that the claimant could perform medium work despite the absence of any "formal assessment of [the claimant's] Residual Functional Capacity . . . either by examining or non-examining physicians addressing [the claimant's] ability to perform work activities such as lifting, standing, walking, bending, carry (sic) or squatting."  344 F. Supp. 2d 1326, 1329 (N.D. Ala. 2004).  The *Thomason* court held that the ALJ "impermissibly substituted his judgment that [the claimant] is able to perform medium work for that of a qualified physician."  *Id.* at 1330.  In *Hernandez v. Barnhart*, the court found that the ALJ erred by relying on the RFC assessment of a reviewing physician because the ALJ's RFC assessment was different from the reviewing physician's assessment.  The court surmised "that the ALJ may have improperly 'played the role of medical expert, interpreted the raw psychological and medical data, and drew her own conclusions as to the claimant's RFC.'"  203 F. Supp. 2d 1341, 1355 (S.D. Fla. 2002) (quoting *Marbury v. Sullivan*, 957 F.2d at 840-41).[10]

In the present case, there are no functional capacity assessments from any treating, examining, or consulting physicians in the record, nor are there any physicians' opinions regarding

---

[10]  The decision in *Brown v. Barnhart*, doc. No. 15, ex. 3, cited by the Commissioner, is not inconsistent with the cases cited in the body of this order.  In *Brown*, the ALJ had three psychiatric review techniques from reviewing physicians as well as a recent consultative examination, each of which were consistent with the ALJ's conclusion that the claimant had no functional limitations arising from her mental impairments. *Id.* at 15-17.

-13-

Dunford's ability to perform specific work activities such as lifting, carrying, sitting, standing, squatting, climbing, etc.  There is no indication in the ALJ's decision that he relied upon the opinion of Dr. Tung, a reviewing physician, that Dunford had no functional limitations.  Rather, the ALJ's determination that Dunford would have limits in the weight she could lift and carry appear to be supported only by the ALJ's reading of the raw medical data before him, improperly substituting himself as the medical expert rather than seeking additional information from Dunford's treating physicians.

Accordingly, remand is required to permit the SSA to develop the record more fully regarding Dunford's functional limitations as of the date she was last insured.  If the evidence indicates that Dunford had any nonexertional impairments arising from pain or other subjective symptoms, the better practice at step five of the analysis is to call upon a vocational expert to determine whether there was work available that Dunford could perform. The law in this circuit requires the ALJ to introduce independent evidence of the existence of jobs in the national economy that the claimant can perform. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).

**VI.     CONCLUSION.**

For the reasons stated above, the decision of the SSA is **REVERSED** and the case is

**REMANDED** for further proceedings.  It is further **ORDERED** that the Clerk of Court shall issue

a judgment consistent with this Order and, thereafter, close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 20, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-15-